JUDGE OETKEN

Owen F. Duffy, Esq.
Law Offices of Owen F. Duffy
*Attorney for the Plaintiff*
5 Penn Plaza, 19th Floor
New York, New York, 10001
Phone: 516-721-8793
Fax: 212-235-7022
Email: Owen@ODuffy-Law.com

George E. Murray, Esq.
Law Offices of George E. Murray
*Attorney for the Plaintiff*
39 Featherbed Court
Trenton, New Jersey 08648
Telephone: 917-539-7364
Email: GEMurrayLaw@aol.com

**14 CV   2168**



United States District Court
Southern District of New York

-------------------------------------------------x

GOLDEN HORN SHIPPING CO. LTD.,

        Plaintiff,

        v.

VOLANS SHIPPING COMPANY LIMITED,
and NORVIK BANKA,

        Defendants.

-------------------------------------------------x

Docket No.: 14 cv _____  (  ) (  )

**VERIFIED COMPLAINT
WITH REQUEST FOR
ISSUANCE OF PROCESS OF
MARITIME ATTACHMENT AND
GARNISHMENT**

      Plaintiff, Golden Horn Shipping Co. Ltd. (hereinafter "Plaintiff Golden Horn"),

by and through its attorneys Owen F. Duffy and George E. Murray, submits this

Verified Complaint against Defendant Volans Shipping Company Limited

(hereinafter "Defendant Volans") and Defendant Norvik Banka (hereinafter

"Defendant Norvik" and collectively the "Defendants"). As and for its Verified Complaint, Plaintiff Golden Horn alleges as follows:

**JURISDICTION AND VENUE**

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and is within this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

2.      This court has original subject matter over this action pursuant to 28 U.S.C. § 1333 (1) because this action arises from a maritime contract, *i.e.* a Bareboat Charter contract for the hire and use of an oceangoing cargo vessel, and the Plaintiff Golden Horn alleges a claim for breach of the maritime contract.

3.      Personal jurisdiction and venue are proper in this Court because: a) the Plaintiff Golden Horn asserts a facially valid *in personam* maritime claim against Defendant Volans and Defendant Norvik; b) the *in personam* Defendants cannot be found within the Southern District of New York; c) the Defendant Norvik has tangible and intangible property within the Southern District of New York that is subject to attachment pursuant to the Federal Rules of Civil Procedure and, more specifically, Rule B of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions; and, d) there is no statutory or general maritime law prohibition to the attachment of Defendant Norvik's property.

## THE PARTIES

4.    At all times relevant hereto, Plaintiff Golden Horn was and still is a foreign business entity organized and existing pursuant to the laws of a foreign state, namely, The Russian Federation.

5.    At all times relevant hereto, Plaintiff Golden Horn maintains its office and principal place of business at 404-25, Berezovaya Str., Vladivostok, 690012, Russian Federation.

6.    At all times relevant hereto, Plaintiff Golden Horn is, among other things, engaged in the businesses of international trade and the transportation of cargo by sea, with its specialty being the trade and transportation of frozen fish caught in the waters of the Russian Far East.

7.    At all times relevant hereto, Defendant Volans Shipping Company Limited was and still is a foreign business entity organized and existing pursuant to the laws of a foreign state, namely, Belize.

8.    At all times relevant hereto, Defendant Volans has represented that it maintains an address at Withfield Tower, Third Floor, 4792 Coney Drive, P.O. Box 1777, Belize City, Belize.

9.    At all times relevant hereto, Defendant Volans was and still is engaged in business solely as the registered owner of the refrigerated cargo vessel known as the M.V. APUS.

10.    At all times relevant hereto, the Defendant Volans was and still is a wholly owned subsidiary of the Defendant Norvik and the Defendant Norvik owns 100% of the shares of Defendant Volans.

3

11.     At all times relevant hereto, and as further detailed below, the Defendant Volans was and still is simply a "brass plate" company for Defendant Norvik without any real existence of its own other than the address at the Withfield Tower in Belize City, Belize.

12.     At all times relevant hereto, Defendant Norvik was and still is a foreign entity organized and existing pursuant to the laws of a foreign state, namely, The Republic of Latvia.

13.     At all times relevant hereto, Defendant Norvik was and still is a joint stock company, whose stock is privately held.

14.     On December 20, 2013, which was just prior to the breach of the maritime contract alleged herein, the Russian oligarch, it was reported in newspapers and business magazines that the Russian oligarch, Grigory Guselnikov, became the majority shareholder of Defendant Norvik.

15.     At all relevant times hereto, Defendant Norvik maintains its office and principal place of business at 21, Ernesta Birznieka-Uplsa Str., Riga, LV-1011, Latvia.

16.     At all relevant times hereto, Defendant Norvik is, among other things, engaged in the businesses of banking and ship ownership.

17.     At all relevant times hereto, and as further detailed below, Defendant Norvik is the alter ego of Defendant Volans with respect to the maritime contract that is the subject of this action.

4

## THE MARITIME CONTRACT

16.     In the summer of 2013, the Defendant Norvik approached the Plaintiff Golden Horn to explore the possibility of Plaintiff Golden Horn chartering a cargo vessel known as the M.V. APUS, which was nominally owned by the Defendant Norvik's subsidiary, the Defendant Volans. A representative photograph of the M.V. APUS from September of 2013, when the vessel was still in Klaipeda, is attached hereto as Exhibit A.

17.     In the summer of 2013, the M.V. APUS was not in service; instead, the vessel was unemployed, idle and the Defendants had the vessel laid up in the port of Klaipeda, which is a port in Lithuania that is approximately 150 miles south west of Riga, Latvia.

18.     The M.V. APUS is a refrigerated cargo vessel and the Defendant Norvik had no use for the vessel, but it knew that Plaintiff Golden Horn specialized in the transport of fish using refrigerated cargo vessels and, therefore, Plaintiff Golden Horn might be interested to charter or purchase the vessel.

19.     Plaintiff Golden Horn, as a Russian company, is able to operate refrigerated cargo vessels in the niche and protected Russian Far East trades, which involves the carriage of fish cargoes in the Exclusive Russian Economic Zones of the Sea of Okhotsk and the Bering Sea and, therefore, it was interested in the refrigerated cargo vessel, M.V. APUS.

20.     In June of 2013, the Plaintiff Golden Horn conducted all of its negotiations for the hire of the M.V. APUS with the vessel's Owner through a broker known as KD Consulting.

21.     The broker was, in turn, negotiating for the hire of the vessel on behalf of Plaintiff Golden Horn exclusively with representatives of the Defendant Norvik and, in particular, with Ms. Jelena Churko who is a senior lawyer for the Defendant Norvik Banka. *See,* Sample of email negotiations between the broker and Norvik Banka attached herewith at Exhibit B.

22.     On July 1, 2013, the Plaintiff Golden Horn and the Defendant Norvik, using the name of its "brass plate" wholly owned subsidiary Volans, entered into a Bareboat Charter contract for the hire of the refrigerated cargo vessel known as the M.V. APUS (hereinafter referred to as the "Bareboat Charter"). A copy of the Bareboat Charter contract for the M.V. APUS is attached hereto as Exhibit C.

23.     The Bareboat Charter agreement is a maritime contract.

24.     On July 1, 2013, the Plaintiff Golden Horn and the Defendant Norvik, using the name of its "brass plate" wholly owned subsidiary Volans, also entered into a second agreement that was in the Russian language in respect of the vessel as the Russian language (hereinafter "Agreement 2"), but Agreement 2 was only for the limited purposes of enabling Plaintiff Golden Horn to enter the vessel in the Register of Ships of the Russian Federation, facilitating the change of the vessel's flag from Belize to Russia and, thereby, make the M.V. APUS eligible to operate the niche and protected Russian Far East trades. *See,* Exhibit D, Agreement dated July 15, 2013, expressly declaring that Agreement 2 was null and void, but for purposes of changing the vessel's register.

25.     It was expressly agreed by Plaintiff Golden Horn and Defendant Norvik that, in the event it was not possible to register the M.V. APUS in the Register

of Ships of the Russian Federation, Agreement 2, which was in the Russian language, would be terminated, but the terms and conditions of the English language Bareboat Charter agreement would remain in force.

26.     In accordance with the terms of the Bareboat Charter, Defendant Volans, as the nominal vessel Owner, agreed to charter the M.V. APUS to Plaintiff Golden Horn, as the Charterer, for a period of 48 months from the time of delivery in exchange for payments monthly of hire in the amount of $47,917.00 per month, plus insurance premiums. *See*, Exhibit C, part II at clause 11 (b)(i).

27.     In accordance with the terms of the Bareboat Charter, Plaintiff Golden Horn was also required to pay the sum of $400,000.00 to the vessel owner as an advance payment toward the hire, *See,* Exhibit C, at Part II, clause 11 (b)(i).

28.     An addendum to the Bareboat Charter contract for the M.V. APUS, which was also executed on July 1, 2013, provided that the ownership of the M.V. APUS would be transferred to the Plaintiff Golden Horn at the expiration of the charter period for no further consideration, so long as the Plaintiff Golden Horn complied with all of its obligations to pay hire during the charter. *See*, Exhibit E, Addendum to the Bareboat Charter contract, dated July 1, 2013.

29.     In accordance with the terms of the Bareboat Charter, the M.V. APUS was to be delivered to Plaintiff Golden Horn on a date during the period from August 15, 2013 through August 25, 2013, at Owner's option. *See*, Exhibit C, at box 14.

30.     In accordance with the terms of the Bareboat Charter, the M.V. APUS was to be delivered to Plaintiff Golden Horn at the port of Klaipeda. *See*, Exhibit C, at box 13.

31.     In accordance with the terms of the Bareboat Charter, the Owner of the M.V. APUS was required to exercise due diligence to make the M.V. APUS seaworthy and in every respect ready in hull, machinery and equipment for the charterer's service before the vessel was delivered to the Plaintiff Golden Horn. *See*, Exhibit C, at Part II, clause 3.

32.     In accordance with the terms of the Bareboat Charter, if the vessel was not timely delivered, Plaintiff Golden Horn had the option of cancelling the Bareboat Charter but, if Golden Horn did not exercise the option to cancel, the Bareboat Charter remained in full force and effect. *See*, Exhibit C, at Part II, clause 5 (a) & (b).

## PLAINTIFF GOLDEN HORN PERFORMED
## IT'S OBLIGATIONS UNDER THE MARITIME CONTRACT

33.     On July 8, 2013, Defendant Norvik invoiced Plaintiff Golden Horn Shipping for the sum of $400,000.00 as provided for in Part II, clause 11 (b)(i) of the Bareboat Charter.

34.     Plaintiff Golden Horn remitted the advance payment of hire, in the amount of $400,000.00 by three installments made on July 11th, 12th & 22nd, 2013 as per the invoice instructions of Defendant Norvik Banka.

35.     The Plaintiff Golden Horn made the advance payment of $400,000.00 to the Defendant Norvik with the understanding, and in reliance on the representations of the Defendant Norvik, that the Defendant Norvik would use the advance payment to repair and upgrade the M.V. APUS so as to put the vessel in

class and into a seaworthy condition before the delivery of the vessel to Plaintiff Golden Horn.

36.     When the Bareboat Charter was agreed to, it was the understanding and agreement of all parties that Plaintiff Golden Horn intended to register the M.V. APUS under the Russian flag so that that the M.V. APUS would be permitted to operate and trade within the Russian exclusive economic zones in the Sea of Okhhosk and the Bering Sea.

37.     On August 30, 2013, the Plaintiff Golden Horn made its application to have the M.V. APUS entered into the Register of Ships of the Russian Federation.

38.     Also, prior to the agreed upon delivery date of the M.V. APUS to the Plaintiff Golden Horn and consistent with its obligations under the Bareboat Charter (Part II, clause 10 (b)), the Plaintiff Golden Horn recruited and hired officers and crew to man the M.V. APUS.

39.     The officers and crew, as hired by Plaintiff Golden Horn came from various places in the world, but, and at the expense of Plaintiff Golden Horn, they did join the M.V. APUS at the Port of Klaipeda in the late summer of 2013 so as to man the vessel.

40.     The Plaintiff Golden Horn also ordered fuel and supplies for the M.V. APUS in anticipation of the delivery of the vessel from the Defendant Norvik.

## DEFENDANT VOLANS BREACHED THE MARITIME CONTRACT

41.     The Defendants did not deliver the M.V. APUS to Plaintiff Golden Horn during the period from August 15, 2013 through August 25, 2013.

42.     Instead, the Defendants encountered a number of delays with the shipyard in Klaipeda that had been hired to repair and upgrade the M.V. APUS so as to put the vessel in class and into a seaworthy condition before the delivery of the vessel to Plaintiff Golden Horn.

43.     The Plaintiff Golden Horn did not, however, exercise its option to cancel the Bareboat Charter contract, but it agreed to allow the Defendants additional time to put the M.V. APUS in class and make the vessel seaworthy and, therefore, the terms and conditions of the Bareboat Charter contract remained in full force and effect.

44.     The time continued to pass through the fall and into the winter of 2013 while Plaintiff Golden Horn waited for Defendants to deliver the M.V. APUS from the shipyard in Klaipeda to Plaintiff Golden Horn.

45.     In October of 2013, Defendant Norvik provided notices to Plaintiff Golden Horn Shipping that the M.V. APUS would be delivered to Plaintiff Golden Horn on October 28, 2013 and, later, another notice from Defendant Norvik advised that the M.V. APUS would be delivered to Plaintiff Golden Horn on November 7, 2013.

46.     The M.V. APUS was not delivered to the Plaintiff Golden Horn on either October 28, 2013 or November 7, 2013, but Plaintiff Golden Horn did not, however, exercise its option to cancel the Bareboat Charter contract as it once again agreed to allow the Defendants additional time to put the M.V. APUS in class and make the vessel seaworthy and, therefore, the terms and conditions of the Bareboat Charter contract remained in full force and effect.

47.    On November 28, 2013, Plaintiff Golden Horn was informed that the Russian Maritime Authority would not accept the M.V. APUS as being seaworthy and safe for registration as a Russian merchant vessel and the primary reason given was that the vessel was fitted with life rafts as opposed to life boats, which were required for Russian vessels.

48.    Shortly thereafter, on December 4, 2013, the Plaintiff Golden Horn was advised the M.V. APUS was nearly ready and complete for delivery to Plaintiff Golden Horn.

49.    Because the M.V. APUS could not be registered as a Russian merchant vessel without lifeboats, the parties agreed, on December 5, 2013, that the Bareboat Charter of the vessel would continue with the vessel retaining its registration in Belize and the parties also agreed that Agreement 2 was terminated.

50.    At this time, Plaintiff Golden Horn was intending to operate the vessel under the flag of Belize for a few months and then, but only after generating some cash flow, it would be in a position to purchase life boats for the M.V. APUS and revisit the plan to register the M.V. APUS as Russian merchant vessel.

51.    On or about December 5, 2013, the technical manager of vessel, Akvaship, which had been nominated by Defendant Norvik prior to the Bareboat Charter, advised the Plaintiff Golden Horn that it would conduct sea trials for the vessel on December 13th & 14th, 2013.

52.    On December 13, 2013, and following a report of satisfactory sea trials, Plaintiff Golden Horn confirmed to the shipbroker and Defendant Norvik's

technical manager, Akvaship, that the M.V. APUS would be accepted by Plaintiff Golden Horn.

53.      As noted above in ¶ 14 herein, on or about December 19, 2013, the majority ownership of the Defendant Norvik changed when the Russian oligarch, Mr. Grigory Guselnikov, acquired the majority ownership of Norvik Banka.

54.      Plaintiff Golden Horn continued to wait for the vessel to be delivered during the remainder of December 2013 and the early part of January 2014.

55.      On or about January 21, 2014, and while still waiting for the M.V. APUS to be delivered into the service of Plaintiff Golden Horn, Plaintiff Golden Horn learned from the Defendant Norvik's technical manager, Akvaship, that the M.V. APUS had already been delivered to another party, the vessel was at sea in the service of the other party and, therefore, the Defendant Volans could not honor its contractual obligations to Plaintiff Golden Horn.

56.      By reason of the premises, as set forth under this heading, the Defendant Volans breached and/or repudiated, without justification, the Bareboat Charter because it did not deliver and it is unable to deliver the M.V. APUS into the service of Plaintiff Golden Horn as was agreed to in the Bareboat Charter agreement.

### DEFENDANT NORVIK BANKA IS LIABLE
### FOR THE BREACH OF MARITIME CONTRACT AS THE ALTER EGO OF
### DEFENDANT VOLANS FOR PURPOSES OF THE BAREBOAT CHARTER CONTRACT

57.      Notwithstanding the formal separate incorporations of the Defendant Volans and the Defendant Norvik, the Defendants were and still are a single business enterprise whose ownership and control is vested entirely with Defendant

Norvik such that any distinction between them, for the purposes of the Bareboat Charter or otherwise, is illusory.

58.    Both the Defendant Volans and the Defendant Norvik are part of the "Norvik Banka" group of consolidated companies.

59.    As reflected in information that is readily available on the Defendant Norik's website, the Defendant Volans was and still is a wholly owned subsidiary of the Defendant Norvik, the Defendant Norvik owns 100% of the shares of Defendant Volans and the Defendant Norvik is the parent, record owner and beneficial owner of the Defendant Volans.

60.    On information and belief, the Defendant Norvik caused the incorporation of Defendant Volans, the Defendant Norvik provided the initial capital for Defendant Volans and the only asset of the Defendant Volans is the M.V. APUS, which the Defendant Norvik simply gave to the Defendant Volans.

61.    In its audited financial statements, the Defendant Norvik represents that it owns a number of subsidiary companies within its "consolidation group," specifically including the Defendant Volans, and the Defendant Norvik also affirmatively represents in the financial statements that its subsidiaries, including the Defendant Volans, are operated "under the control of the Bank as a parent entity."

62.    In its audited financial statements, the Defendant Norvik represents that it has total control over its subsidiaries, including the Defendant Volans, which it achieves by governing the financial and operating policies of the subsidiaries so as obtain the benefits from the subsidiaries' activities.

63. In the case at hand, Defendant Norvik has so governed, dominated and disregarded Defendant Volans' corporate form that Defendant Volans was actually carrying on the business of Defendant Norvik instead of its own.

64. Defendant Norvik conducted all of the negotiations for the Bareboat Charter on behalf of Defendant Volans and, in particular, Ms. Jelena Churko, who is a senior lawyer for the Defendant Norvik, conducted such negotiations. See, Exhibit B.

65. Ms. Churko held no position with the Defendant Volans, the ostensible owner of the M.V. APUS.

66. Girts Strajums executed the Bareboat Charter contract on behalf of the Owner of the M.V. APUS. *See*, Exhibit C at page 2.

67. When Girts Strajums executed the Bareboat Charter contract on behalf of the vessel's Owner, Mr. Strajums was employed as the head of corporate banking at the Norvik Banka in Riga, Latvia.

68. Mr. Strajums' position as a representative of the Defendant Volans was merely incidental to his employment by the Defendant Norvik.

69. As with the Bareboat Charter, Girts Strajums of the Norvik Banka also executed the Addendum on behalf of the Owner of the M.V. APUS for the sale of the M.V. APUS to Plaintiff Golden Horn at the end of the charter hire term. *See*, Exhibit E.

70. No individuals independently associated with the Defendant Volans were involved in any of the negotiations or decision making leading up to the execution of the Bareboat Charter or the Addendum thereto.

71. The formal Bareboat Charter, which was drafted by Defendant Norvik, provided that all correspondence for the vessel Owner was to be directed to 21,

Ernesta Birznieka-Uplsa Str., Rica, LV-1011, Latvia, which is the address of Defendant Norvik Banka, and all such correspondence was to be addressed to Mr. Andrejs Svirchenckovs and Ms. Jelena Rusakova, both of whom are employees or officers of the Defendant Norvik and neither of them are officers or employees of the Defendant Volans.

72.    With respect to the payment of the initial advance of $400,000.00 against hire, the Defendant Norvik generated the invoice for same and the invoice was presented to the Plaintiff Golden Horn by Ms. Jelena Rusokova, a senior lawyer for the Defendant Norvik.

73.    With respect to the Bareboat Charter agreement and the vessel Owner's performance of the Bareboat Charter agreement, the Defendant Volans did not have any discretion at all because all decisions made on behalf of Defendant Volans, the nominal vessel Owner, were actually made and controlled by Defendant Norvik, and such decisions, amongst others, included the appointment of Akvaship to act as Owner's technical manager while the vessel was being repaired in Klaipeda and, at the insistence of the Defendant Norvik, Akvahip's role was to continue during the term of the Bareboat Charter when the vessel was in the service of Plaintiff Golden Horn.

74.    Upon information and belief, the Defendant Volans does not have any office space from which it conducts any business.

75.    Upon information and belief, the Defendant Volans does not have any employees or accounting staff.

76.     Upon information and belief, all of the business of the Defendant Volans is conducted by employees of the Defendant Norvik Banka from the offices of Defendant Norvik in Riga, Latvia.

77.     The Defendant Norvik retains responsibility for preparing the financial statements of the Defendant Volans, and the Defendant Norvik handles all of the Defendant Volans' accounts and finances.

78.     All of the business of the Defendant Volans in connection with the maritime contract at issue in this action was conducted by employees of the Defendant Norvik Banka from the offices of Defendant Norvik Banka in Riga, Latvia using the Defendant Norvik's bank email addresses and, thus, there is common office space, address, telephone numbers and email addresses between the Defendants.

79.     Because Defendant Volans has no employees, all dealings between the Defendant Volans and Defendant Norvik are not conducted at arms' length.

80.     As set forth under this heading, the Plaintiff Golden Horn alleges a plausible alter ego claim against the Defendant Norvik that is sufficiently detailed and contains particularized factual allegations to support the suggestion that the Defendant Norvik dominated and controlled the Defendant Volans to such a degree that the corporate veil should be pierced in order to achieve an equitable result.

81.     By reason of the premises, as set forth under this heading, the Defendant Norvik, as the alter ego of Defendant Volans, breached and/or repudiated, without justification, the Bareboat Charter because it did not deliver and

it is unable to deliver the M.V. APUS into the service of Plaintiff Golden Horn as was agreed to in the Bareboat Charter agreement.

### PLAINTIFF GOLDEN HORN SUSTAINED AND IS ENTITLED TO AN AWARD OF DAMAGES BY REASON OF THE DEFENDANTS' BREACH OF THE MARITIME CONTRACT

82.     As a consequence of the breach of the Bareboat Charter agreement, the damages that the Plaintiff Golden Horn sustained fall under the headings of several categories, including, but not limited to: loss of the advance hire payment; the costs of arranging to perform its obligations under the Bareboat charter, *i.e.* the hire of the officers and crew, transportation for same and the incidental expenses for surveys, vessel registration and supplies for the vessel; and the foreseeable loss of profits that the Plaintiff Golden Horn would have earned as the charterer of the M.V. APUS.

83.     With respect to the loss of profit, the Plaintiff Golden Horn submits that it had negotiated several lucrative freight voyages for the vessel while it was waiting for the delivery of the M.V. APUS and, if the Bareboat Charter been honored, Plaintiff Golden Horn would have earned substantial profits while operating the M.V. APUS in its service for the full duration of the Bareboat Charter.

84.     The Plaintiff Golden Horn further submits that there was no other suitable vessel that it could have chartered to perform the voyages that it intended to perform with the M.V. APUS under the Bareboat Charter Agreement.

85.     For the purposes of this case, the Plaintiff Golden Horn has employed used a well accepted and conservative methodology for calculating its loss of profit

17

damages based on actual gross freights that vessels like the M.V. APUS were able to earn (commonly referred to as an average time charter equivalent rate) in several trades, less its payments toward hire and costs that would have been required to earn the freights during the Bareboat Charter agreement, to arrive at net revenue.

86.     The reasonable and foreseeable loss of profit that Plaintiff Golden Horn suffered by reason of the breach of the Bareboat Charter amounts to $2,283,776.20.

87.     The Plaintiff Golden Horn further submits that, in accordance with the Addendum to the Bareboat Charter agreement, it would have been in a position to sell the M.V. APUS for scrap at the end of the Bareboat Charter for the sum of $1,000,000.00.

88.     As best as presently can be calculated, the total damages for which Plaintiff Golden Horn seeks Process of Maritime attachment and judgment in this action are as follows:

| | |
|---|---|
| Recovery of the advance payment against hire: | $    400,000.00 |
| Costs & Expenses incurred in preparation for taking delivery of the vessel in Klaipeda: | $    101,917.00 |
| Loss of Profit: | $ 2,283,776.20 |
| Profit from the sale of the M.V. APUS: | $ 1,000,000.00 |
| Prejudgment Interest on claim for damages: | $    150,000.00 |
| Recoverable legal fees and costs: | $      25,000.00 |
| Total Claim for Damages: | $ 3,960,693.20 |

## COUNT I

### PLAINTIFF ASSERTS A VALID
### *PRIMA FACIE* CLAIM FOR BREACH OF A MARITIME CONTRACT

89.     Paragraphs 1 through 88 of this Verified Complaint are repeated and realleged as if the same were set forth at length herein.

90.     The Plaintiff Golden Horn has fully performed all of it obligations under the maritime contract, but the Defendant Volans has failed to perform its obligations pursuant to the Bareboat Charter and, therefore, Defendant Volans breached the maritime contract with Plaintiff Golden Horn.

91.     The Plaintiff Golden Horn has sustained damages as consequence of Defendant Volans' breach of the maritime contract.

92.     Despite due demand, Plaintiff's damages have not been satisfied by the Defendant Volans.

93.     By reason of the premises, Plaintiff Golden Horn demands judgment against Defendant Volans, in an amount to be proven, but as best as can now be presently calculated are in the amount of $3,960,693.20.

## COUNT II

### DEFENDANT NORVIK BANKA IS LIABLE FOR BREACH
### OF THE MARITIME CONTRACT AS THE ALTER EGO OF DEFENDANT VOLANS

94.     Paragraphs 1 through 93 of this Verified Complaint are repeated and realleged as if the same were set forth at length herein.

19

95.     As more specifically detailed by the factual allegations set forth in ¶s 57 through 81, the Defendant Norvik is the alter ego of the Defendant Volans for purposes of the Bareboat Charter agreement and this action and, therefore, the Defendant Norvik is liable to Plaintiff Golden Horn for all of the damages that Plaintiff Golden Horn sustained for breach of the Bareboat Charter.

96.     Despite due demand, Plaintiff's damages have not been satisfied by the Defendant Norvik.

97.     By reason of the premises, Plaintiff Golden Horn demands judgment against Defendant Norvik, in an amount to be proven, but as best as can now be presently calculated are in the amount of $3,960,693.20.

## COUNT III

### PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT SHOULD ISSUE AGAINST THE PROPERTY OF DEFENDANT NORVIK BANKA THAT IS OR WILL BE WITHIN THIS DISTRICT IN THE HANDS OF GARNISHEES

98.     Paragraphs 1 through 97 of this Verified Complaint are repeated and realleged as if the same were set forth at length herein.

99.     Pursuant to the terms of the Bareboat Charter agreement, any dispute arising out of or in connection with the Bareboat Charter agreement shall be referred to arbitration *at the discretion of the plaintiff* in London. See, Exhibit C, at Part II, clause 30 (c).

100.     By reason of the premises set forth in ¶ 93, the Plaintiff Golden Horn expressly reserves all of its rights to arbitration, but maintains that the instant action is appropriate and necessary to obtain *quasi-in-rem* jurisdiction over the

property of the Defendant by way of Maritime Attachment and Garnishment pursuant to Rule B so as to obtain security for its damages.

101.    After a diligent investigation, and as more fully set forth in the accompanying affidavit of Owen F. Duffy, neither the Defendant Volans or the Defendant Norvik can be "found" within this judicial District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

102.    Based on investigations conducted on behalf of the Plaintiff, and as more fully set forth in the accompanying affidavit of Owen F. Duffy, the Defendant Norvik has or will have assets within this judicial District comprising of, *inter alia*, cash, funds, credits, debts, bank accounts and/or letters of credit belonging to, due or for the benefit of Defendant Norvik (collectively hereafter "Assets"), including but not limited to cash and funds on deposit (in the name of either Norvik Banka or JSC "Norvik Banka") with Deutsche Bank Trust Company Americas, at 60 Wall Street, New York, New York 10005, or at such other garnishees that may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

103.    As more fully set forth in the accompanying affidavit of Owen F. Duffy, the Defendant Norvik maintains a correspondent bank account (in the name of either Norvik Banka or JSC "Norvik Banka") with the Deutsche Bank Trust Company Americas, which is identified by Account No. 04-441-604, so as to have access to the U.S. financial system and to facilitate the payment and receipt of payments in U.S. dollars and, therefore, Assets of the Defendant Norvik are held in the account at the Deutsche Bank Trust Company Americas and the Defendant Norvik has Assets within this District.

**WHEREFORE,** Plaintiff Golden Horn Shipping Co., Ltd. respectfully prays that this Honorable Court grant the following relief:

A. That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint herein, failing which a default judgment may be entered against the Defendants;

B. That this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant Rule B attaching all of the Defendants' tangible or intangible property or any other funds held by any Garnishee, up to an amount sufficient to satisfy Plaintiff Golden Horn's claims, but not less than $3,960,693.20.

C. That this Court retain jurisdiction over this matter through the entry of a judgment in favor of Plaintiff for the amount of its claim, with costs, and that a judgment be entered against the property of the Defendants attached herein in the amount of the Plaintiff's claim, plus costs to be paid out of same;

D. That Plaintiff Golden Horn may have such other, further and different relief as may determined by the Court to be just and proper in the circumstances.

Dated: March 26, 2014
New York, New York

Owen F. Duffy, Esq.
Law Offices of Owen F. Duffy
*Attorney for the Plaintiff*
5 Penn Plaza, 19th Floor
New York, New York, 10001
Phone: 516-721-8793
Fax: 212-235-7022
Email: Owen@ODuffy-Law.com

22

s/ *George E. Murray*
George E. Murray, Esq.
Law Offices of George E. Murray
Attorney for the Plaintiff
39 Featherbed Court
Trenton, New Jersey 08648
Telephone: 917-539-7364
Email: GEMurrayLaw@aol.com

## VERIFICATION OF COMPLAINT

Owen F. Duffy, pursuant to the provisions of 28 U.S.C. § 1746, hereby declares and states as follows:

1.     I am an attorney admitted to practice before this Court, and I am the attorney for the Plaintiff Golden Horn Shipping Company in this matter.

2.     I make this declaration for the purpose of verifying the foregoing Complaint.

3.     I have read the foregoing Complaint, and I declare that the contents of the Complaint are true to the best of my knowledge, information and belief.

4.     The sources of my information and the grounds for my belief are communications received from representatives of the Plaintiff and examination of documents provided to me by the Plaintiff.

5.     The reason that this verification is made by the undersigned, as opposed to the Plaintiff, is that Plaintiff is a foreign business entity resident in Vladivostok, Russia and no officer or director of the Plaintiff is presently within this District.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 26, 2014
       New York, New York

_____
Owen F. Duffy