UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                                             :

GOLDEN HORN SHIPPING CO. LTD.,      :

                                 Plaintiff,    :

                                                                             :      14-CV-2168 (JPO)

                                 -v-                             :

                                                                             :      OPINION AND ORDER

VOLANS SHIPPING CO. LTD. and NORVIK   :
BANKA,                                                            :

                                    Defendants.  :

-------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiff Golden Horn Shipping Company Limited ("Golden Horn") brings this admiralty action against Defendants Volans Shipping Company Limited ("Volans") and Norvik Banka ("Norvik") alleging breach of a charter agreement for the M.V. Apus ("the Vessel"). Pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure, Golden Horn attached $3,960,693.20 from Norvik's correspondent account at Garnishee Deutsche Bank in Manhattan.[1] Norvik moves to vacate the attachment under Supplemental Rule E(4). For the reasons that follow, Norvik's motion is denied.

**I.**      **Background**[2]

      In the summer of 2013, Norvik approached Golden Horn about chartering the Vessel, which was owned by Norvik's subsidiary, Volans, a Belizean corporation. Volans was represented in the negotiations by Jelena Churko, a senior attorney at Norvik. Eventually, the negotiations resulted in two agreements that constitute a "bareboat charter" between Volans and

---

[1] $71 worth of that money is in Volans's name. Defendants do not contest the attachment of the $71.

[2] The following facts are taken from the Complaint. (Dkt. No. 1.)

Golden Horn.  (*See* Dkt. No. 1, Complaint at ¶ 26.)  The charter allowed Golden Horn to use the Vessel to transport frozen fish in the Sea of Okhotsk and the Bering Sea in exchange for $47,917 per month plus insurance.  Defendants were supposed to deliver the Vessel to Golden Horn sometime between August 15 and August 25, 2013.

The Vessel, it turned out, had serious mechanical problems.  Defendants missed the initial delivery date.  Golden Horn agreed to extend the deadline several times.  It continued to wait for the Vessel, which it believed was at a shipyard in Klaipeda, Lithuania, undergoing repairs.  But in January of 2014, Norvik revealed that it had delivered the Vessel to another shipping company.  Three months later, on March 28, 2014, Golden Horn served Deutsche Bank with a writ of attachment for Norvik's correspondent account and filed suit against Defendants.  This Court granted Golden Horn's request for the attachment.

## II. Discussion

Norvik moves to vacate the attachment of its assets on two grounds.  First, it argues that the money belongs to its customers and is therefore not subject to attachment.  Second, it argues that Golden Horn has failed to make a prima facie case that Volans is Norvik's alter ego.

### A. Legal Standard

When a defendant challenges an attachment pursuant to Rule E(4), the burden is on the plaintiff to establish that the requirements of Rule B have been met.  *See Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006), *abrogated on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009); *see also Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 493 (2d Cir. 2013).  Under Rule B, a plaintiff must show that: "(1) it has a valid prima facie admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment."

*Blue Whale*, 722 F.3d at 493. Norvik challenges the first and third requirements. It challenges the first requirement only on the ground that Golden Horn does not state a valid prima facie alter ego claim. Norvik concedes that the claim properly sounds in admiralty. It challenges the third requirement only on the ground that the money in the Deutsche Bank account does not belong to Norvik. It concedes that all other requirements have been met.

Although extraneous evidence may be considered on a motion to vacate an attachment, "plaintiffs in a Rule E(4)(f) proceeding should not be required to prove their case." *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 279 (S.D.N.Y. 2006) (Lynch, J.) (citing *Japan Line, Ltd. v. Willco Oil Ltd.*, 424 F. Supp. 1092, 1094 (D. Conn. 1976) (Newman, J.)); *see also Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V.*, 07-CV-3076, 2007 WL 1989309, at *4 (S.D.N.Y. July 6, 2007) ("maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing."). Instead, "a plaintiff seeking a maritime attachment need not provide any supporting evidence; its complaint should suffice." *C. Transp. Panamax, Ltd. v. Kremikovtzi Trade E.O.O.D.*, No. 07-CV-893 (LAP), 2008 WL 2546180, at *3 (S.D.N.Y. June 19, 2008). This rule makes sense in light of the requirement that the plaintiff in an attachment case present a verified complaint signed by counsel. *Id.* By asserting facts in its complaint, a plaintiff's counsel exposes herself to liability if those facts turn out to be false. *Id.* Thus, the Court may consider the extraneous evidence presented by the parties, but Golden Horn does not have a burden to present any such evidence apart from its verified complaint.

Federal common law governs a plaintiff's attempt to hold a parent company liable in an admiralty case. *See Blue Whale*, 722 F.3d at 488 (citing *Lauritzen v. Larsen*, 345 U.S. 571 (1953)). Under federal common law, shareholders are not ordinarily liable for the obligations of the corporations they own. "Under the doctrine of limited liability, a corporate entity is liable for

3

the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as piercing the corporate veil." *Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.*, 622 F. Supp. 2d 46, 53 (S.D.N.Y. 2009) (quoting *Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007)). Federal common law in the Second Circuit provides two ways to pierce the corporate veil. The plaintiff can show that the defendant used its alter ego "to perpetrate a fraud *or* [that it] ha[s] so dominated and disregarded [its alter ego's] corporate form" that the alter ego was actually carrying on the controlling party's business instead of its own. *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980) (emphasis added). Golden Horn argues only an alter ego theory; it does not allege fraud.

   Notwithstanding the persistent dictum that a plaintiff should be able to pierce the corporate veil on an alter ego theory only in extraordinary circumstances, plaintiffs in this district commonly survive Rule E(4) motions by piercing corporate veils. *E.g.*, *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 508 (S.D.N.Y. 2012); *Classic Mar. Inc. v. Limbungan Makmur SDN BHD*, 646 F. Supp. 2d 364, 371 (S.D.N.Y. 2009); *C. Transp. Panamax*, 2008 WL 2546180, at *3; *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.*, 519 F. Supp. 2d 399, 410 (S.D.N.Y. 2007); *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 282 (S.D.N.Y. 2006); *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, 06-CV-15375, 2007 WL 831810, at *4 (S.D.N.Y. Mar. 15, 2007); *Brave Bulk Transp. Ltd. v. Spot On Shipping Ltd.*, No. 07-CV-4546 (CM), 2007 WL 3255823, at *6 (S.D.N.Y. Oct. 30, 2007); *Route Holding, Inc. v. Int'l Oil Overseas, Inc.*, 06-CV-3428 [Dkt. No. 24] (S.D.N.Y. October 17, 2006). Shipping companies frequently own each vessel through a separate corporation but conduct operations exclusively through a parent company. While veil piercing as a general matter might be appropriate only in extraordinary circumstances, maritime

cases appear to present those circumstances—at least sufficiently to survive a motion to vacate an attachment—relatively frequently.

"Veil piercing determinations are fact specific and differ with the circumstances of each case." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777–78 (2d Cir. 1995) (internal quotation marks and citation omitted). As such, the alter ego determination must be made in view of "the totality of the facts." *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000). There are several factors relevant to determining whether one entity is the "alter ego" of another. These include:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of business discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Matter of Arbitration Between Holborn Oil Trading Ltd. & Interpol Bermuda Ltd.*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991). No single factor is dispositive. Courts should weigh them all. *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008) ("Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." (internal quotation marks omitted)).

### B. Whose Money Is in the Account?

Norvik argues that the money in the Deutsche Bank account is not properly its money. The money is in a correspondent bank account at Deutsche Bank that Norvik contends it maintains only for the benefit of its banking customers. Because Norvik is not licensed as a bank in the United States, it maintains the correspondent account with Deutsche Bank so that its

clients can conduct transactions in the United States. It argues that the money in the Deutsche Bank account is properly considered its customers' money, not its own, because the customers are the beneficial owners—notwithstanding the fact that the account is maintained in Norvik's name.

Although the question whether a plaintiff has made a prima facie maritime case is governed by federal common law, the question whether a given property interest is attachable is governed by state law. *See Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 70 (2d Cir. 2009). In its opening memorandum of law, Norvik asserts that New York law holds "that a foreign account holder's interest in correspondent account credits is sufficient to justify vacatur of an attachment of those credits with respect to a claim against the foreign bank (not the customers) . . . ." (Dkt. No. 8, Defendants' Memorandum of Law, at 8 (emphases removed) (citing *Cargill Fin. Serv. Int'l v. Bank Fin. & Credit Ltd.*, 70 A.D.3d 456 (N.Y. Sup. Ct. App. Div. 1st Dep't 2010).) Thus, Norvik argued,[3] New York law holds that the interest in a correspondent bank account does not belong to the corresponding bank. It belongs to that bank's customers.

Norvik misreads *Cargill*. (*See id.*) In that case, as Norvik eventually concedes, the First Department held that New York courts have equitable discretion to vacate an attachment against a correspondent account. *Cargill* did not hold that correspondent accounts are not the property of the corresponding bank. (*Contra id.* ("[T]he beneficial interest in the credits housed in Norvik's correspondent account at Deutsche Bank belongs ***to the customers of Norvik*** rather than of [*sic*] Norvik itself.") (emphases in original).) Indeed, one court in this district has made

---

[3] Norvik seems to have abandoned this argument in its reply.

clear that *Cargill* does *not* control this situation. *See Toisa Ltd. v. Pt. Transamudra Usaha Sejahtera*, 13-CV-01407-JMF [Dkt. No. 28] (S.D.N.Y. Sept. 20, 2013) (ruling from the bench).[4]

In its reply memorandum, Norvik—citing *Toisa*—asks this Court to exercise its "equitable discretion" to vacate the attachment. (Dkt. No. 18, Reply Memorandum of Law, at 9.) But the discretion of New York courts to vacate attachments made under New York law is irrelevant to the question whether this Court has—or should use—discretion to vacate attachments made under federal law. Norvik contends that (presumably under federal law) this Court's discretion to vacate an attachment "does not have defined limits." (*Id.* (citing *Aqua Stoli*, 460 F.3d at 445.) Even if this is so, Norvik has not pointed to any reason why this Court should exercise that discretion here.

In *Toisa*, Judge Furman held that correspondent bank accounts are the property of the correspondents' customers where there is evidence that the money has not yet been credited to those customers in their home bank accounts. In other words, Norvik's argument would succeed here if it could show that the specific funds attached belonged to its customers. Norvik has offered no evidence that any money—other than the $71 in Volans's name—belongs to anyone but Norvik. Instead, it offers evidence that "Norvik had approximately USD 57 million in [the Deutsche Bank] account . . . . At that same time, Norvik had customer USD accounts which totalled [*sic*] USD 540,852,968.98." (Dkt. No. 9, Declaration of Jelena Curko, at ¶ 27.) That the money is there for the *purpose* of facilitating transactions on behalf of Norvik customers in the United States does not mean that the money *belongs* to those customers. *See Toisa*, 13-CV-

---

[4] Norvik's counsel represented the plaintiff in *Toisa*. Their misreading of *Cargill* in their opening brief—and their failure to mention that *Toisa* has already decided this issue against the position they advance here—is therefore puzzling.

7

01407-JMF.  There is no reason to believe that the $3.9 million subject to attachment represents a credit to any of Norvik's customers.  The Court is persuaded that the money is Norvik's.

### C.      Piercing the Veil

Norvik also moves to vacate the attachment on the ground that Golden Horn has not made a prima facie case that Volans is its alter ego.  Golden Horn has pleaded several facts in its verified complaint that support its argument.  Norvik—through its wholly owned subsidiary "investment fund"—owns 100% of the stock of Volans.  (Dkt. No. 1, Complaint ¶ 59.)  Norvik created Volans.  (*Id.* ¶ 60.)  In its audited financial reports, Norvik states that Volans is operated "under the control of [Norvik]."  (*Id.* ¶ 61.)  Volans conducted all negotiations for the bareboat charter through Jelena Curko, who is a senior attorney at Norvik.  (*Id.* ¶ 64.)  Girts Strajums, head of corporate banking for Norvik, executed the charter on behalf of Volans.  (*Id.* ¶ 67.)  The charter agreement directs that all correspondence with Volans—ostensibly a Belizean entity with offices in Belize City[5]—be directed to Norvik's address in Riga.  (*Id.* ¶ 71.)  Initial invoices were generated by Norvik through its attorney, Jelena Resokova.  (*Id.* ¶ 72.)  Volans has no employees.  (*Id.* ¶ 75.)  Norvik prepares Volans's financial statements.  (*Id.* ¶ 77.)

Norvik offers a few facts to rebut these allegations.  It contends that "Volans was not wholly-owned by Norvik but rather two corporate layers (the Investment Fund—a separate and distinct corporate entity which only providing [*sic*] investment strategy for the Sub-Funds) and the Sub-Funds (in turn 100% shareholders of Volans) existed between Norvik and Volans." (Dkt. No. 8, Defendants' Memorandum of Law, at 10.)  But Norvik does not contend that there

---

[5] Golden Horn's complaint alleges, "on information and belief," that Volans has no office space, but that "Volans has represented that it maintains an address at Withfield Tower, Third Floor, 4792 Coney Drive, P.O. Box 1777, Belize City, Belize."  (*Compare* ¶ 8, *with* ¶ 74.)  It is not clear whether this address is a physical address at which business can be conducted or a post office box.

are any other investors in either the investment fund or the sub funds.  Its contention, therefore, does not rebut Golden Horn's claims that Norvik wholly owned Volans.  Next, Norvik contends that by "execut[ing] powers of attorney for certain Norvik personnel . . . to review the Vessel's . . . activities," it demonstrated "corporate actions taken by the actual parent of Volans [which] show that corporate formalities were being observed." (*Id.*)  It is hard to see why the powers of attorney—particularly given the fact that Volans has no employees of its own—reflect an adherence to corporate formalities.  Finally, Norvik contends that "[w]hen the Vessel was sold to an outside entity, the sale proceeds were applied to pay off *Norvik*'s mortgage as mortgagee of the Vessel." (*Id.* (emphasis added).)  This cuts against Norvik's position.

In response to Golden Horn's allegation that Volans lacks office space, Norvik contends that "it would not be unusual for a single ship entity to not have dedicated office space." (Dkt. No. 8, Defendant's Memorandum of Law, at 17.)  But it is also not unusual for courts to find that single ship entities are alter egos of their parent companies.  And in response to Golden Horn's allegations that Norvik purported in its financial statements to control Volans, Norvik contends that Volans does not appear in Norvik's 2013 financial statements. (*Id.* at 15.)  But the reason Volans does not appear on that particular statement is that *Norvik sold Volans* and, according to Golden Horn, thereby breached the charter agreement. (*Id.*)  Norvik concedes that in earlier financials, when it *did* own Volans, it "represent[ed] that it ha[d] total control over . . . Volans." (*Id.*)  It argues only that "this language is quite common in financial statements." (*Id.*)  This argument does not advance its position.

Finally, Norvik contends that Golden Horn's allegation that Norvik provided the bill for the initial payments is false. (*Id.* at 12 (citing (Dkt. No. 9, Declaration of Jelena Curko, Exhibit 19).)  Indeed, the cited invoice is apparently from Volans and Golden Horn does not have an explanation for this inconsistency.  As such, the Court will not consider this allegation as part of

the alter ego analysis. Similarly, Norvik contends that it did not cause the incorporation of Volans but rather acquired it from a debtor. The evidence is not crystal clear on this point. Nonetheless, the Court will disregard this allegation in the alter ego analysis.

Considering the remaining factors, the Court concludes that Golden Horn has amply made a prima facie case that Volans was Norvik's alter ego. Golden Horn has shown a disregard of corporate formalities, complete overlap in ownership, common office space, addresses, and email addresses of the two corporations. It has shown that Volans lacked independent employees and, therefore, that it lacked any business discretion and that the dealings between it and Norvik could not have been at arm's length. Finally, it has shown that the corporations are not treated as independent profit centers on Norvik's financial statements. These allegations exceed those in cases that have survived Rule E(4) motions on alter ego theories. *E.g.*, *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 282 (S.D.N.Y. 2006). Norvik's motion to vacate the attachment is denied.

### III. Conclusion

For the foregoing reasons, Norvik's motion to vacate the attachment of its assets at Deutsche Bank is hereby DENIED.

The Clerk of the Court is directed to close the motion at docket number 7.

SO ORDERED.

Dated: November 6, 2014
       New York, New York

_____
J. PAUL OETKEN
United States District Judge